Joseph W. CAPWELL, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3489.

Court of Appeals of Alaska.

Dec. 20, 1991.

Rich Curtner, Asst. Public Defender, Palmer, and John B. Salemi, Public Defender, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Joseph W. Capwell was convicted of criminally negligent homicide, AS 11.41.-130(a), for striking and killing a pedestrian with his car. He appeals both his conviction and his sentence. We affirm Cap-

well's conviction but remand for resentencing.

On July 11, 1989, around 4 o'clock in the afternoon, Capwell was driving on Seward Meridian Road in Wasilla. Shelley Cleveland was walking along the side of the road, accompanied by her young niece. Capwell's car, traveling between 35 and 45 miles per hour, struck Cleveland; she was killed almost instantly.

The weather was clear and sunny. Capwell's vehicle drifted over the right-hand fog line of the road for no apparent reason. Capwell did not apply his brakes either before or for several seconds after he struck Cleveland. He stopped his car 50 or 60 yards down the road, sat there for several seconds, and then backed up toward the site of the collision. But instead of coming to check on Cleveland's condition, Capwell climbed out of his car, walked around to the front, and inspected his bumper. He then leaned against the side of his car and lit a cigarette. Capwell did not attempt to help Cleveland, nor did he even look toward her.

Capwell's defense was that, suffering chest pains, he had been driving to Valley Hospital when the pain distracted him and reduced his control of the vehicle, thus causing the collision. When the State Troopers arrived at the scene, Capwell told one trooper that he was suffering from chest pains. He also told this to the emergency medical technicians who responded to the collision and transported Capwell to Valley Hospital. About an hour and a half after the accident, Capwell spoke with a physician at Valley Hospital and elaborated on these statements: Capwell told the doctor that he had been driving to the hospital at the time of the collision so that he could be examined for chest pains.

Evidence was presented that Capwell in fact suffers from a medical condition that causes him chest pain: costochondritis, an inflammation of the ribs where they join the breastbone.

In an effort to rebut Capwell's assertion that he had been going to the hospital to be examined for severe chest pains, the prosecution introduced the testimony of two emergency room physicians, Dr. Janet Smalley and Dr. Donald Hudson. Both of these physicians, one working in Palmer and the other in Anchorage, testified that Capwell had come to their emergency medical facilities numerous times. During the year preceding the collision, Capwell made 17 appearances in the Palmer emergency room. Capwell also made 26 visits to the Anchorage emergency room. Each time, Capwell complained of pain—often, pain in his chest, but also dental pain, headaches, and backaches. Each time, Capwell wanted medication, generally morphine, to ease the pain.

Both Dr. Smalley and Dr. Hudson testified that, when a patient accumulates a history like Capwell's, physicians suspect that the patient is employing the emergency room as a source for narcotics, with pain being the excuse rather than the real reason for the numerous visits. Dr. Smalley sat down with Capwell on two occasions and discussed her concern that he was becoming narcotic dependent and was misusing the emergency room. Dr. Smalley testified that, following these conversations, there were two occasions on which Capwell arrived at the emergency room and peeked into the nurses' station to see who was the on-duty physician; when he saw that Dr. Smalley was the on-duty physician, Capwell left the hospital without signing in as a patient.

Capwell asserts that the trial court should not have allowed the State to introduce the testimony of the two doctors. Capwell argues that the jury became unfairly prejudiced against him when it heard him referred to as a "drug seeker", and he asserts that, since there was no testimony that he was using drugs at the time of the collision, the doctors' testimony could not have been relevant to any issue at the trial.

We conclude that Judge Cutler acted within her proper discretion when she admitted the doctors' testimony. Capwell's defense was premised on the argument that he was suffering chest pain at the time of the collision, pain so severe that it distracted him from the road and prevented him from exercising normal control over

his vehicle. The testimony of Dr. Smalley and Dr. Hudson tended to show that, even if Capwell had been driving to the hospital as he asserted, his motivation was to obtain narcotics, not to have a doctor alleviate unexpectedly intense pain. The testimony thus had substantial relevance to a major issue at trial: whether, as Capwell claimed, there was a medical explanation for his failure to notice Cleveland walking along the roadway. Moreover, Judge Cutler could reasonably find that the probative force of this evidence outweighed whatever potential for unfair prejudice it might have.

■ Capwell contests one other evidentiary ruling of the trial court. Judge Cutler allowed the prosecution to introduce evidence that, at the time of the collision, Capwell's driver's license was suspended; Capwell's license had been suspended when he failed to satisfy a judgement entered against him from an earlier traffic accident. The prosecution contended, and Judge Cutler agreed, that, because Capwell's license was suspended, it was reasonable to conclude that Capwell's assertions of chest pain had been fabricated in order to offer the authorities some plausible reason why Capwell was driving.

In the trial court and now on appeal, Capwell asserts that whatever motivation he might have had to explain his act of driving while his license was suspended pales beside his motivation to explain how he had run over and killed a pedestrian. Capwell argues that, if his assertion of chest pain was suspect, it was because of the homicide charge he faced, not the driving with suspended license charge. Moreover, Capwell asserts that this evidence carried great potential for unfair prejudice: the jury could conclude, from the fact that a civil judgement had been entered against him, that Capwell had been at fault in the prior motor vehicle accident.

We agree with Capwell. The State was entitled to introduce evidence of Capwell's possible motives to lie about experiencing severe chest pain. However, under the circumstances of this case, the motivation provided by the imminent homicide charge far outweighed whatever additional motivation was provided by the suspended status of Capwell's license. The possibility that evidence of Capwell's license suspension might unfairly prejudice the jury's deliberations—that the jury, hearing evidence indicating that Capwell had been at fault in a prior traffic accident, might assume from this that he had probably been negligent in this case—outweighed the minimal incremental probative value of the evidence.

Nevertheless, we are convinced that the admission of this evidence did not have an appreciable effect on the jury's verdict. *Fields v. State,* 629 P.2d 46, 51 (Alaska 1981); *Love v. State,* 457 P.2d 622, 629–631 (Alaska 1969). The evidence at trial provided no reasonable explanation for the collision absent negligence on the part of Capwell.

The fact that Capwell suffers from costochondritis was undisputed at trial. However, the medical testimony showed that Capwell's condition does not normally cause the kind of pain that would prevent him from driving or impair his ability to handle a car. In this same vein, the testimony of Drs. Smalley and Hudson revealed good reason to believe that, even though Capwell has costochondritis, Capwell's journey to the hospital was not motivated by incapacitating chest pain.

Indeed, while Capwell complained of chest pain when he spoke to the trooper at the scene of the collision and attributed the collision, in part, to the fact that he had been distracted by this pain, Capwell did not attribute the collision to chest pain when he spoke an hour later with his treating physician at Valley Hospital. Capwell explained the collision to the physician by asserting that he had leaned over to flick his cigarette into the car's ashtray and that, while his eyes were off the road, he heard a thump. Capwell never asserted to the doctor that he had been distracted by any pain he was suffering; his only explanation for the collision was his attention to the cigarette and the ashtray.

An additional factor in our harmless error analysis is that the improper testimony did not play a major part in the trial. Mention of Capwell's license suspension was

confined to a short opening portion of Capwell's interview with the state trooper who arrived at the scene of the collision. While the prosecuting attorney mentioned the license suspension in his closing argument to the jury, this was done only once and in passing.

Finally, Judge Cutler gave the jury a lengthy instruction that explained the reason for Capwell's license suspension; Judge Cutler took pains to tell the jury that Capwell's suspension did not stem from a violation of any criminal statute or traffic regulation, but rather from his failure to pay a civil judgement stemming from an accident. She also emphasized that this judgement had been issued by default—that no judge or jury had ever found Capwell to have been at fault in the prior accident. Judge Cutler explicitly told the jury that they were "to judge [Capwell's] negligence without regard to whether or not he did have a license at the time [of the collision]", and that the evidence of the license suspension was to be used only to the extent that Capwell's knowledge that his license was suspended might be relevant to some other determination the jury would have to make.

Given the strength of the government's evidence against Capwell, the small part that the license suspension evidence played at Capwell's trial, and the detailed limiting instruction fashioned by the trial court, we conclude that the error in admitting evidence of Capwell's license suspension was harmless. *Sevier v. State,* 614 P.2d 791, 794 (Alaska 1980); *Stevens v. State,* 748 P.2d 771, 775–76 (Alaska App.1988).

We turn now to Capwell's sentencing arguments. Judge Cutler found that the State had proved three aggravating factors: AS 12.55.155(c)(7) (commission of a prior felony of a more serious class than the present one), (c)(4) (use of a dangerous instrument during the offense), and (c)(10) (most serious type of conduct encompassed by the statutory definition). Capwell contests each of these aggravating factors.

In 1977, when Alaska's prior criminal code was still in force, Capwell was convicted of assault with intent to commit rape,

former AS 11.15.160. This felony offense carried a penalty of from one to fifteen years' imprisonment. Judge Cutler concluded that this prior offense was of a more serious class than Capwell's present offense and that aggravating factor (c)(7) therefore applied to Capwell's case.

Capwell disputes this ruling. He points out that, until the legislature enacted the current criminal code, felony offenses were not given classifications. Therefore, he argues, it is impossible to declare that a felony offense under the old criminal code is of a more serious "class" than a felony offense defined by the current code. Capwell also argues that it is impossible to find an exact analogy to the former offense of "assault with intent to commit rape" in the current criminal code.

■ Capwell is correct that there is no exact analogy to "assault with intent to commit rape" in the present criminal code. However, when applying aggravator (c)(7) to felonies committed under prior law, this court has looked to the offense defined by current law that is the nearest equivalent to the defendant's prior felony. *See Hayes v. State,* 785 P.2d 33, 37–38 (Alaska App. 1990); *Gibson v. State,* 719 P.2d 687, 691 (Alaska App.1986).

■ The nearest equivalent to Capwell's prior offense under current law is "attempted sexual assault in the first degree" or, because Capwell's offense involved a twelve-year-old child, "attempted sexual abuse of a minor in the first degree". Both of these offenses are class A felonies. AS 11.41.410, AS 11.41.434, and AS 11.31.-100(d)(2). The maximum penalty for class A felonies is twenty years' imprisonment. AS 12.55.125(c). This maximum penalty more closely approximates the fifteen-year maximum term for "assault with intent to commit rape" than does the five-year maximum term for class C felonies like negligent homicide. Moreover, under current Title 11, offenses involving the deliberate use of violence against another person are at least class B felonies.

For these reasons, we conclude that Judge Cutler properly treated Capwell's

prior conviction for assault with intent to commit rape as a felony of a more serious class than his present negligent homicide conviction.

■ Capwell also argues that Judge Cutler should not have found aggravator (c)(7) because there is no apparent connection between Capwell's sexual attack on a minor in 1977 and his negligent homicide in this case. The answer to this contention is that none is needed. While a complete lack of relationship between a defendant's prior, more serious felony and his current felony might be a reason for the sentencing judge not to rely heavily on this aggravating factor, the factor is still proved.

■ Capwell's next argument is that Judge Cutler committed error when she ruled that the State had proved aggravating factor (c)(4), the use of a dangerous instrument. Capwell points out that AS 12.55.155(e) precludes a sentencing court from enhancing a sentence based on an aggravating factor listed in AS 12.55.155(c) if that factor "is a necessary element of the present offense". He argues that this rule precluded Judge Cutler from finding aggravator (c)(4). Capwell notes that the definition of "dangerous instrument" contained in AS 11.81.900(b)(11) and made applicable to presumptive sentencing by AS 12.55.185(2) is quite expansive:

> "dangerous instrument" means any deadly weapon or anything that, under the circumstances in which it is used ... is capable of causing death or serious physical injury[.]

Based on this definition, Capwell argues that it is all but impossible to commit a homicide without using a dangerous instrument, and thus the use of a dangerous instrument is a necessary element of his crime, negligent homicide.

Capwell's argument has already been considered and rejected in *Krasovich v. State,* 731 P.2d 598 (Alaska App.1987). In *Krasovich,* this court pointed out that there are (concededly rare) instances in which a defendant could be held criminally liable for a homicide even though the defendant had not used a dangerous instrument. *Id.* at 600. Thus, use of a danger-

ous instrument is not a necessary element of negligent homicide.

■ However, the *Krasovich* opinion also pointed out that proof of an aggravating factor does not automatically lead to enhancement of a presumptive term. The importance of an aggravating factor must be evaluated in light of the specific crime involved in the defendant's case; when the presence of a particular aggravating factor is characteristic of the crime for which the defendant has been convicted, then mere proof of that aggravating factor will not, of itself, justify an enhancement of the presumptive term. *Id.* at 600–01. With regard to the specific issue Capwell raises, this court stated:

> [U]se of dangerous instruments is characteristic of [negligent homicide] and the automobile is ... characteristically used in committing the offense[;] it would be unrealistic to conclude that the use of an automobile is, in and of itself, a sufficient basis for increasing the presumptive term.
>
> Our inquiry must therefore shift to the particular circumstances of the case before us; we must determine whether there was anything uncharacteristically serious about the manner or circumstances in which [the defendant] used his automobile.

*Krasovich,* 731 P.2d at 602. Thus, while Judge Cutler properly concluded that aggravating factor (c)(4) had been proved, proof of this factor would not ordinarily justify an increase in Capwell's presumptive term.

■ Nevertheless, Judge Cutler's sentencing remarks point to various circumstances showing Capwell's use of an automobile to be atypically serious. Capwell had been convicted of five moving violations; these included speeding, speeding in a school zone, failure to stop (two separate convictions), and failure to yield. Capwell's license had been suspended because he had failed to pay for property damage he had caused in a previous collision. Capwell knew he was not supposed to be driving at all. He had been convicted once before of

driving with a suspended license. This conviction represented the second time that Capwell had driven a car after his license had been suspended; in the previous incident, the potential charge of driving with a suspended license had been reduced to the lesser offense of driving without a license.

To justify his act of driving in the present case, Capwell contended that he had had a need for emergency medical attention. Judge Cutler found that this proffered justification was false.

Judge Cutler also found that Capwell's conduct was so negligent that his offense approached the seriousness of the next higher degree of criminal homicide, manslaughter. Capwell struck a plainly visible woman walking along the side of the road. He neither hit his brakes nor took evasive action to avoid the collision. No explanation for the collision can be found in the lighting or the weather or the condition of the road or the condition of Capwell's vehicle. Judge Cutler concluded that Capwell "just totally failed to perceive what was in [his] line of travel".

■ These factors provide support for Judge Cutler's decision to enhance Capwell's sentence based on aggravating factor (c)(4). They also underlie and support Judge Cutler's ruling that Capwell's crime was among the most serious encompassed by the definition of the offense, aggravating factor (c)(10).

We turn now to Capwell's argument that Judge Cutler committed error when she sentenced Capwell to five years' imprisonment, the maximum term for negligent homicide.

■ The first problem to be discussed is whether Capwell received a "maximum sentence". Judge Cutler believed that, because she was not exercising her discretion under AS 12.55.115 to restrict Capwell's eligibility for parole, she was not sentencing Capwell to the maximum term. The State's brief neither endorses Judge Cutler's view of this issue nor formally concedes error. If the State's failure to support Judge Cutler's ruling indicates disagreement with it, this court would still be required to independently assess the correctness of the trial court's ruling. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972).

The Alaska Supreme Court has held that a sentencing court does not impose a "maximum sentence" if the judge sentences a defendant to the maximum term of imprisonment but then suspends a portion of that term. *Wertz v. State,* 611 P.2d 8, 10 (Alaska 1980). However, Supreme Court cases have never drawn a distinction between imposing the maximum term of years (none suspended) and imposing the maximum term of years while additionally restricting or denying parole eligibility. Instead, the court has treated maximum terms of imprisonment without parole restriction as "maximum sentences". *See,* for example, *Ferguson v. State,* 606 P.2d 382 (Alaska 1980); *Tommy v. State,* 551 P.2d 179 (Alaska 1976); and *State v. Wortham,* 537 P.2d 1117 (Alaska 1975). *But see Hansen v. State,* 582 P.2d 1041 (Alaska 1978), where two members of the Supreme Court stated that parole eligibility should not make a difference when deciding whether a sentence is excessive, *Id.* at 1047 n. 12, and two other members of the court disagreed, *Id.* at 1048.

■ We conclude that the purposes of sentence review are better served by the interpretation that a defendant receives a "maximum sentence" if he or she is sentenced to the maximum term of imprisonment, whether or not the sentencing judge restricts or denies parole eligibility. Thus, Capwell's sentence of five years' imprisonment with none suspended constitutes a "maximum sentence".

■ In order to justify imposition of a maximum sentence, the sentencing judge must find, either explicitly or implicitly, that the defendant is a "worst offender". *Jacinth v. State,* 593 P.2d 263, 267 (Alaska 1979); *Tommy v. State,* 551 P.2d at 180 n. 2; *Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971). This determination can be based on the defendant's criminal record, upon the circumstances of the present crime, or both. *Moore v. State,* 597 P.2d 975, 976 n. 4 (Alaska 1979).

▉ The pre-sentence report shows that Capwell was convicted of assault with intent to commit rape in 1977. Capwell, who was thirty years old at the time, approached his twelve-year-old stepdaughter with a knife in his hand; he put the blade to her throat and ordered her to take off her clothes. The girl escaped by jumping through a second-story window when Capwell momentarily relaxed his guard. In her subsequent interview with the police, the girl related how Capwell had raped her at knife point when she was ten years old.

Capwell was sentenced to serve five years in jail for this sexual assault. He was released on probation in May 1980. In March 1982, Capwell was convicted of misdemeanor theft and was given a suspended sentence. Between May 1983 and November 1987, Capwell was convicted of the seven motor vehicle offenses mentioned above.

Psychological evaluations done of Capwell in 1976 (while Capwell was awaiting trial and later awaiting sentencing for sexually assaulting his stepdaughter) indicated that Capwell had little insight into his behavior. Capwell could provide no explanation for his attack on his stepdaughter. The examiner concluded that Capwell's prognosis was "not the best", noting that Capwell had had psychiatric problems for many years.

Two years later, in 1978, Capwell was evaluated again at the request of prison officials. Capwell expressed displeasure with the Parole Board for refusing to parole him until he had received psychiatric treatment. Although Capwell had pleaded guilty to the sexual assault of his stepdaughter and had provided the pre-sentence investigator with a written statement in which he again confessed this crime, by 1978 Capwell had changed his mind about the offense. He now told the psychiatrist that he was not guilty and that he had pleaded guilty "because of questioning by the police [and because] he did not want his wife to go through the hassle of a lengthy hearing." He asserted that the witnesses who had testified at the grand jury were lying.

The psychologist who administered the Minnesota Multiphasic Personality Inventory to Capwell in September 1978 concluded:

[Capwell] appears to be a person who tries to deal with his problems by pretending that they do not exist. In times of emotional stress, he may express his difficulties in functional complaints such as headaches and stomach disorders.

He appears to be a rigid person who is prone to fears, compulsive behavior and obsessions. Despite worry and tension, he is likely to be resistant about obtaining help for his problems.

The test results ... are strongly suggestive of a major emotional disorder. The test pattern resembles those of psychiatric out-patients who later require in-patient care.

In May 1979, Capwell was evaluated again because he had applied for parole. Capwell continued to protest that he was not guilty of the sexual assault for which he had been sent to prison.

During the sentencing hearing in the present case, Judge Cutler confided that, as she began to prepare for Capwell's sentencing, she believed she would impose no more than three years to serve even if the State proved all of its aggravators. However, as she read the pre-sentence report and became acquainted with Capwell's past offenses and the psychological evaluations of Capwell, Judge Cutler concluded that Capwell's "cold and callous behavior" at the scene of the collision was characteristic "of the way he functions.... He just didn't really [understand] how serious the situation was, and in a sense maybe [he] still doesn't. That sort of person is very dangerous because ... they have no self-controls when it comes to doing those things that hurt other people, and they haven't really learned anything significant about controlling their behavior...."

Judge Cutler pointed out that Capwell was a mature adult who had already served a lengthy term of imprisonment and who had been "offered about everything the system has for rehabilitation". The judge added, "One person has been viciously raped, somebody else has been killed, and

what we seem to know about Mr. Capwell from what's in the [pre-sentence] report is that there really isn't much hope for improvement." Judge Cutler continued,

[W]hen you read Mr. Capwell's presentence report in its entirety, including the old pre-sentence report [from the assault with intent to rape conviction], the attachments to it, the numerous psychiatric and psychological evaluations and opinions ..., his background from a small child until today, the things he's done with his life ..., and you couple that with the circumstances of this offense and [his conduct following] this offense ...[,] it's really incumbent on the court to protect the public from Mr. Capwell.

Judge Cutler found that the chances for Capwell's rehabilitation were "minimal" and that "isolation [of the offender] is probably the most important goal here[,] in order to protect other people."

Judge Cutler announced that she was "not prepared to say that Mr. Capwell is the worst type of offender[.] But he is certainly very close to the worst offender, and this is very close to a worst offense[.]" For that reason, Judge Cutler imposed a sentence that she viewed as "just slightly under the maximum"—five years' imprisonment to serve, with normal eligibility for parole.

Judge Cutler's view of the seriousness of Capwell's offense, her view of the danger he poses to the public, and her conclusion that there is little chance for his rehabilitation are all supported by the record. A significant sentence of imprisonment, exceeding even the three-year presumptive term for a third offender, would not be clearly mistaken.

However, as discussed above, we conclude that Judge Cutler's sentencing decision is premised on a misapprehension of the definition of "maximum sentence". She in fact gave Capwell a maximum sentence when she sentenced him to serve five years with none suspended. For this reason, we reverse the superior court's sentence and remand for imposition of a sentence consistent with this opinion.

Capwell's conviction for negligent homicide is AFFIRMED. His sentence is REVERSED. This case is REMANDED for resentencing.